# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 07-CV-4354 (JFB)

BETTY BEHLING,

Plaintiff,

VERSUS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

Defendant.

**MEMORANDUM AND ORDER**
February 6, 2009

JOSEPH F. BIANCO, District Judge:

Plaintiff Betty Behling ("plaintiff" or "Behling") brings this action pursuant to Section 1631(c)(3) of the Social Security Act, 42 U.S.C. 1383(c), seeking review of the decision of the Commissioner of Social Security ("defendant" or "Commissioner"), dated September 14, 2007, determining plaintiff to be ineligible for Supplemental Security Income under Title XVI of the Social Security Act ("the Act").

Presently before the Court is defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons herein, the Court grants defendant's motion for judgment on the pleadings and affirms the decision of the Administrative Law Judge ("ALJ").

I. BACKGROUND[1]

A. Administrative Proceedings

On March 31, 2005, plaintiff filed for a period of disability and disability insurance benefits ("DIB") that alleged an onset of disability on December 31, 2000, which was denied on August 16, 2005. (Tr. 45, 24, 26-29.) Plaintiff then timely requested a hearing by an ALJ on August 31, 2005 (Tr. 25), and she appeared with her attorney and presented testimony at this hearing on May 21, 2007. (Tr. 218-37.)

---

[1] All facts described below are taken from the "Transcript of the Administrative Record" ("Tr."), filed on February 14, 2008.

On June 13, 2007, after considering the matter *de novo*, the ALJ issued a written decision (Tr. 8-15) in which he concluded, among other things, that the "claimant was not under a 'disability' as defined in the Social Security Act prior to December 31, 2003" and that her "impairments did not prevent [her] from performing her past relevant work prior to December 31, 2003." (Tr. 15.) This decision became the final decision of the Commissioner on September 14, 2007, when the Appeals Council denied plaintiff's request for review. (Tr. 4-7.)

### B. Personal History

Plaintiff claimed that she became unable to work on December 31, 2000 due to carpal tunnel syndrome, diabetes, hypertension, and back pain. (Tr. 45.) Since plaintiff met the insured status requirements of the Act only through December 31, 2003, she was eligible for DIB only from December 31, 2000 to December 31, 2003. (Tr. 12.) At the time of the ALJ's decision, plaintiff was a "61 year old individual with a high school education and past relevant work experience as a telephone company supervisor." (Tr. 12.) As a telephone company supervisor, Behling indicated that she answered telephones, typed, trained new employees, and wrote evaluations and that she walked one hour a day, stood one hour a day, sat five and one-half hours a day, and handled, grabbed, or grasped things seven and one-half hours a day. (Tr. 222.) At her hearing on May 21, 2007, plaintiff described her former job duties as paperwork and writing reports, sometimes by hand. (Tr. 233.) Plaintiff is a high school graduate and took three semesters at community college. (Tr. 51, 221.) She claimed that she did not work after retirement from the telephone company in March of 1998 because of her carpal tunnel, high blood pressure, diabetes, and age. (Tr. 222.)

### C. Medical History

Prior to December 31, 2003, the date when plaintiff was last insured and qualified for DIB ("DLI"), she was diagnosed with bilateral carpal tunnel syndrome in March of 2003, and conservative treatment with a follow-up in six to eight weeks, or sooner if new symptoms developed, was recommended. (Tr. 134.) It was noted by Dr. Christopher Durant, the orthopedist who diagnosed plaintiff's carpal tunnel syndrome, that, in terms of the history of the illness:

> This is a 51-year-old female patient with complains [sic] of numbness in the right and left hand fingers, more so in the right than on the left hand. The patient's symptoms have been present for approximately six months. She complains of having nocturnal paresthesias. She has been using the cock-up splint but she tends to experience what appears to be an allergic facial reaction.

(Tr. 134.) An electromyograph ("EMG") taken on March 11, 2003 showed evidence of "bilateral median, motor and sensory nerve compression on the wrist with mild right sensory axonal loss." (Tr. 134.) Dr. Durant noted that plaintiff's cervical range of motion was normal, that she had good range of motion of her shoulders, elbows, and fingers bilaterally, and that there was no evidence of atrophy in her hands. (Tr. 134.) An x-ray taken on March 7, 2003 of plaintiff's bilateral wrists was also "normal" and "[n]o fractures or dislocations [were] seen." (Tr. 137.)

Plaintiff also saw Dr. Stephan Simons at the Queens-Long Island Medical Group, P.C., on May 12, 2003 for facial tenderness and was

2

diagnosed with neuralgia. (Tr. 188.) In July and August 2003, Dr. Simons renewed her prescriptions, including those for hypertension and diabetes. (Tr. 187.) In September of 2003, he also noted that plaintiff was "getting spasms in feet > hands esp at night" and that her blood pressure was 150/85. (Tr. 187.) Dr. Simons diagnosed plaintiff with hypertension and diabetes. (Tr. 187.) On October 22, 2003, he also indicated that her "sugar 'very bad'" and blood pressure was 140/70. (Tr. 186.) He repeated his diagnoses of diabetes and hypertension in October and December of 2003. (Tr. 185-86.)

Throughout the year of 2003, plaintiff also saw an endocrinologist at the Queens-Long Island Medical Group, P.C., who recommended diet and exercise (Tr. 190) and noted that her blood pressure ranged from 130/80 - 145/80 during this time frame. (Tr. 189-191.) On November 18, 2003, the endocrinologist's impressions listed diabetes, hypertension, hypercholesterol, and a right thyroid cyst. (Tr. 194.) A thyroid ultrasound report of December 4, 2003 confirmed a "bulky rt. lobe with enlarging complex cyst" and that plaintiff's medical history was "diabetes, HBP" and her medications were "Glucophage, Avandia, Diovan, Acupril." (Tr. 192.)

Plaintiff's medical history following her last date insured of December 31, 2003 reveals that she continued to see Dr. Durant, who on March 11, 2005, reported that:

> This is a 61-year-old female patient with complains [sic] of numbness and tingling in the right and left hand fingers associated with nocturnal paresthesias. She reports to have numbness when getting up in the morning and the symptoms have been present since 2003. She has been using cock-up splints but she remained symptomatic. She also reports to have triggering in the right thumb for many years as well. She tends to drop object [sic] from her left hand at times.

(Tr. 133.) A physical examination revealed that her "[c]ervical spine range of motion is satisfactory in all directions tested" and "[r]ange of motion of both shoulders, elbows, wrists and right and left hand fingers are satisfactory in all directions tested." (Tr. 133.) Also, her bilateral wrist Tinel sign, Phalen test, and her bilateral elbow Tinel sign were all negative. (Tr. 133.) Dr. Simons' impressions were that plaintiff had bilateral carpal tunnel syndrome and right thumb trigger finger. (Tr. 133.) He discussed conservative versus surgical treatment with the plaintiff and noted that she "is undecided regarding surgical intervention to her hands." (Tr. 133.)

On September 10, 2004, an exam by Dr. Jatinder Singh of the Queens-Long Island Medical Group, P.C., indicated that "[e]xamination of the right thumb demonstrates no evidence of any fracture, dislocation, subluxation, osteomyelitis, or other abnormality." (Tr. 135.) Dr. Singh also found from an x-ray of the lumbar spine that his impression was that plaintiff had osteoarthritis. (Tr. 136.)

In her own function report of March 6, 2005, plaintiff stated that she walked to her doctor's appointments, watched television, prepared her meals daily, ironed her clothes, washed dishes and intermittently cleaned her home. (Tr. 67-70.) She did not do yard work, however, because it entailed pain. (Tr. 70.) She also drove and shopped for food and clothes in stores, by phone, and by mail. (Tr. 70-71.) Behling stated that she used braces for

3

her hands because of carpal tunnel syndrome at bedtime and that she could only walk for about ten minutes at a time. (Tr. 73.) Plaintiff claimed to first experience the pain across her back in 2000 and that her carpal tunnel interfered with her housework, writing, washing dishes, and opening bottles. (Tr. 76.) She indicated that cortisone shots relieved the pain for a few weeks. (Tr. 76.)

In April and May of 2006, neurological evaluations of plaintiff by Dr. Fawzy Salama indicated that "[p]hysical examination today revealed a healthy-looking lady in no apparent distress" and that "[c]ranial nerves examination II-XI was within normal range." (Tr. 138.) Plaintiff was able to "heel-walk and tiptoe" and there was "no rigidity noted in any of the left upper and lower extremities." (Tr. 138.) There was, however, "partial tremors of both hands, left worse than the right" and "mild dysmetria and finger-to-finger and finger-to-nose testing on the left side." (Tr. 138.) She was instructed to use primidone for her tremors and continue with the dosage at the time of her supportive vitamins for diabetic neuropathy. (Tr. 138.)

In November of 2006, Dr. Simons completed a questionnaire in connection with plaintiff's claim for DIB. In that questionnaire, Dr. Simons reported that plaintiff suffered from "diabetes, hypertension, diabetic neuropathy, chronic kidney disease – stage 3, carpal tunnel syndrome, depression." (Tr. 207.) He also noted that she has persistent tremors and sensory disturbances and significant interference with "use of the fingers, hands, and arms." (Tr. 207-08.) Dr. Simons opined that plaintiff suffered from moderate impairment as a result of her medical condition and her pain would cause her to be absent from work about one day a month, on average. (Tr. 211.) In an eight-hour workday, Dr. Simons stated that plaintiff could sit for seven hours, stand for six hours, and walk for four hours. (Tr. 213.) He further reported that she could never carry anything over twenty-six pounds, but could frequently hold things up to ten pounds. (Tr. 213.) Plaintiff could never stoop, balance, or crawl, but she could climb, kneel, and crouch occasionally. (Tr. 213.) Her physical functions of reaching, hearing, and speaking were impaired by "difficulty grasping objects, tingling and numbness with reduced sensation in hands, and blurred vision." (Tr. 214.) Finally, he reported that plaintiff's symptoms and limitations existed at the same or similar degree of severity since December 31, 2000. (Tr. 209-16.)

Plaintiff testified at her hearing on May 21, 2007 that carpal tunnel affected her sleep, which in turn caused fatigue, and that medications she took for high blood pressure made her dizzy. (Tr. 229-30.) She also stated that numbness in her feet had been around for at least three years and that they were getting worse. (Tr. 231.) Behling further testified that three or four years earlier, she did not have difficulty holding on to small things. (Tr. 232.)

II. PROCEDURAL HISTORY

Behling filed her complaint in this action on October 18, 2007. On February 25, 2008, the defendant submitted his answer and, on March 24, 2008, defendant filed the instant motion. Plaintiff submitted an affidavit in opposition to the instant motion on April 17, 2008.

III. STANDARD OF REVIEW

A district court may only set aside a determination by an ALJ that is based upon legal error or that is unsupported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme

Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (adopting the Supreme Court's definition in *Richardson* of "substantial evidence"). Furthermore, "[i]t is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *See, e.g., Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 ("[t]he court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review.") (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

IV. DISCUSSION

A. Applicable Law

"A claimant is entitled to Social Security benefits under the Act if the claimant is unable to 'engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months and where the existence of such impairment was demonstrated by evidence obtained by medically acceptable clinical and laboratory techniques." *Benitez v. Astrue*, No. 04 Civ. 5188 (RJS), 2008 WL 2216276, at *6 (S.D.N.Y. May 23, 2008) (internal citations omitted). "A claimant for disability insurance benefits under the Act is eligible only if her impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Sobelewski v. Apfel*, 985 F. Supp. 300, 308 (E.D.N.Y. 1997).

A five-step inquiry, set forth by the Social Security Administration's regulations, is used is to evaluate a claim for DIB. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has repeatedly summarized this evaluative process:

> The first step of this process requires the Secretary to determine whether the claimant is presently employed. If the claimant is not employed, the Secretary then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the Secretary next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the Secretary will find the claimant disabled. However, if the claimant does not have a listed impairment, the Secretary must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform

5

her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the Secretary determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the Secretary to prove in the fifth step that the claimant is capable of working. *See Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

The Secretary's regulations provide charts that are used to determine what type of work the claimant is capable of performing. *See* 20 C.F.R. § 404, Subpt. P, App. 2. These charts set forth several factors such as a claimant's age, education, and previous work experience, and indicate whether a claimant has the residual functional capacity to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary.

*Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *accord*, *e.g.*, *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); *DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998). "In making his determination by this process, the Commissioner must consider four factors: '(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)). Furthermore, if a claimant has multiple impairments, the Commissioner must consider the combined effect of those impairments. *Sobolewski*, 985 F. Supp. at 309 (citing *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995)).

B. Application

After carefully reviewing the ALJ's decision and the medical evidence before him, the Court finds that substantial evidence supports the ALJ's decision.

As an initial matter, the ALJ determined that DIB may not be paid unless plaintiff was disabled while she met the insured status requirements of Section 216(i) of the Social Security Act. (Tr. 12.) He determined that "[i]nformation contained in the claimant's earnings record reveals that she acquired sufficient quarters of coverage to remain insured through December 31, 2003" (Tr. 12), which is her DLI, in other words. Plaintiff does not dispute that her DLI is December 31, 2003, which she acknowledged at her hearing. (Tr. 222.)

Applying the five-step inquiry set forth by the regulations, the ALJ found that, at step one, plaintiff had not engaged in substantial gainful activity since her alleged onset date. (Tr. 13.) That plaintiff did not work following her retirement in 1998 is uncontested in the record. At step two, the ALJ found that her diabetes mellitus and bilateral carpal tunnel "more than minimally affected her ability to perform basic work activities prior to December 31, 2003, and, therefore, constituted 'severe' impairments." (Tr. 13.)

6

However, at step three, the ALJ found that there was "no evidence in the record of objective clinical or laboratory evidence indicating that these impairments considered singly or in combination, met or equaled the requisite criteria of the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4." (Tr. 13.) In order to be found disabled under step three of the five-step analysis, a plaintiff with diabetes mellitus or carpal tunnel must meet particular requirements under the regulations.[2] Because this Court finds that the record (including plaintiff's medical record prior to her DLI) lacks any evidence that her impairments met the aforementioned criteria set forth by the regulations prior to her DLI, the Court agrees with the ALJ's determination on this issue. With respect to her carpal tunnel syndrome, the record shows that plaintiff had good range of motion of her shoulders, elbows, and fingers bilaterally and no evidence of atrophy in her hands. (Tr. 134.) Dr. Durant recommended only conservative treatment with cock-up splint. (Tr. 134.) Plaintiff did not seek further treatment for carpal tunnel syndrome until two years later in March of 2005. (Tr. 133.) With respect to plaintiff's diabetes, it was not accompanied by "significant and persistent disorganization of motor function in two extremities," acidosis, or visual impairment, as required by the Listing of Impairments. *See infra* note 2.

The ALJ then continued with step four of the analysis, where he deemed that plaintiff's claim failed because plaintiff was determined to have had, at the time of her DLI, the residual functional capacity to perform her past work as a telephone company supervisor. Under step four of the inquiry, the ALJ is required under the regulations to base the decision regarding

---

[2] 20 C.F.R. Part 404, Subpt. P, App. 1, 9.08 provides:

> 9.08 Diabetes mellitus. With:
>
> A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or
>
> B. Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or pCO2 or bicarbonate levels); or
>
> C. Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

Even though carpal tunnel syndrome is not explicitly covered by the Listings, neurological impairments are governed by Listing 11.00, which provides in relevant part:

> C. Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Part 404, Subpt P, App. 1. § 11.00(c).

residual functional capacity on all relevant evidence in the record. *See* 20 C.F.R. § 404.1545(l)(a). Although the ALJ must consider the evidence in the record, the ALJ need not "reconcile explicitly every conflicting shred of medical evidence," especially when those shreds are unsupported by the weight of the evidence in the record. *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983). After reviewing the record, the Court finds the ALJ's decision regarding plaintiff's residual functional capacity was supported by substantial evidence. In particular, the Court agrees that, although Behling was diagnosed with diabetes, hypertension, and carpal tunnel prior to December 31, 2003, there is no objective medical evidence in the record to indicate that these conditions, either separately or taken together with the addition of "back pain," significantly limited her ability to function as a telephone company supervisor.

The record reflects that, in March 2003, plaintiff claimed that she had symptoms of carpal tunnel syndrome for approximately six months. (Tr. 134.) Nonetheless, her orthopedist noted that she had good range of motion of her fingers and that there was no evidence of atrophy in her hands. (Tr. 134.) An x-ray revealed that her bilateral wrists were normal. (Tr. 137.) Even though an EMG indicated "mild right sensory axonal loss" on the wrist, Dr. Durant recommended conservative treatment. (Tr. 134.) And although plaintiff was also diagnosed with hypertension that year (Tr. 185-86), plaintiff's blood pressure was generally within normal limits. (Tr. 189-91.) It is similarly true that there is no evidence that her diabetic condition or back pain significantly limited plaintiff's ability to function prior to December 31, 2003.

Furthermore, plaintiff's medical record following December 31, 2003 also supports the ALJ's determination. In March of 2005, Dr. Durant reported that her range of motion for her wrists and fingers continued to be satisfactory and that her wrist Tinel sign and Phalen test were negative. (Tr. 133.) An exam in September of 2004 indicated that plaintiff's right thumb, which had been diagnosed as a right thumb trigger finger by Dr. Durant, had no evidence of any fracture, dislocation, subluxation, osteomyelitis, or other abnormality. (Tr. 135.) In particular, Dr. Simons' questionnaire, completed in November of 2006, indicated that, although plaintiff suffered from tremors and other impairments, her medical condition only caused "moderate impairment" and pain. (Tr. 211.) Plaintiff asserts that on the day that Dr. Simons completed the questionnaire, she "was taking at least six different pills for [her] blood pressure so [she] wouldn't dispute that day it was good." (Plaintiff's Affidavit in Opposition, at 1.) This does not change the overall information conveyed by that report, however, which indicated that plaintiff did not suffer from any condition or the combination of several conditions, that seriously impacted her ability to function. The ALJ concluded that "[b]ased on this recent assessment and the limited medical evidence pertaining to the record before December 2003, it is reasonable to infer that the claimant essentially maintained at least the same physical abilities as of December 2003, or three years earlier." (Tr. 14.) The Court agrees that plaintiff's medical record, viewed in its entirety pre- and post-December 31, 2003, supports the ALJ's determination that her symptoms were not severe enough to qualify her for DIB prior to December 31, 2003.[3]

---

[3] This is also consistent with her non-medical record, in which plaintiff stated that she was able to walk to her doctor's appointments, watch television, prepare her meals daily, iron her clothes, wash dishes, drive, go grocery shopping, and

Specifically, it is clear that plaintiff retained the residual functional capacity to perform her past work. Plaintiff described her former work as a telephone company supervisor to require that she answer telephones, type, write evaluations, and sometimes write reports. (Tr. 12, 222.) The record, however, does not indicate that her state of carpal tunnel syndrome, diabetes, high blood pressure, or any other medical condition prohibited or severely impacted her ability to perform any of those job duties. Even if plaintiff had to handle, grab, or grasp things for seven and one-half hours a day (Tr. 222), she testified that she had no trouble holding on to small things in 2003. (Tr. 232.) Prior to her DLI, plaintiff had good cervical range of motion, as well as good range of motion of her shoulders, elbows, and fingers bilaterally. (Tr. 134.) An x-ray of her bilateral wrists was normal. (Tr. 134, 137.) Her chest and heart exams were normal, and she showed no edema of her extremities (Tr. 157, 159-90.) Plaintiff also stated that as part of her work, she walked one hour a day, stood one hour a day, and sat the majority of her time, for about five and one-half hours per day. Dr. Simon's questionnaire reported that she could walk for four hours, stand for six hours, and sit for seven hours. In an effort to counter this point, plaintiff states that her "complaint wasn't about standing and sitting [her] major complaint was and still is the carpel tunnel in both hands, the right being the worst, diabetes and high blood pressure." (Plaintiff's Affidavit in Opposition, at 1-2.) As discussed *supra*, however, the medical evidence supporting her claims regarding carpel tunnel, diabetes, and high blood pressure, are, in totality, insufficient to show that plaintiff lacked any residual work capacity prior to December 31, 2003. Even though the ALJ acknowledged that plaintiff did have limited capacity, he determined that plaintiff could perform work that would be consistent with a "light" level of exertion. (Tr. 14.) Therefore, because plaintiff's former job entailed no more than such "light" exertion, the ALJ was correct in concluding that claimant did not qualify as "disabled" within the meaning of the Act on step four grounds.

Plaintiff claims that "[w]hat my doctors call moderate to me is severe." (Plaintiff's Affidavit in Opposition, at 1.) However, a plaintiff's subjective feelings about pain, unsubstantiated by or contrary to a doctor's evaluation, is not by itself a basis for the award of DIB. *See* 20 C.F.R. 404.1529 ("However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged"). On this issue, the Court also defers to the determination of the ALJ, who rejected plaintiff's testimony as to the severity of her conditions as not credible because the evidence in the record failed to corroborate it (*see* Tr. 14-15), since it is the province of the Commissioner, and not the Court, to weigh the conflicting evidence. *See Clark*, 143 F.3d at 118.

Finally, plaintiff's claim that she is now unable to work (Plaintiff's Affidavit in Opposition, at 1) is also insufficient to the extent that it is unsupported by any medical evidence or to the extent it applies to plaintiff's condition now, rather than at the time of her last insured status. Similarly, her complaints regarding any "side effects" that she has suffered "the last couple years from all the different medications" (Plaintiff's Affidavit in Opposition, at 2) are unavailing, because her last insured status was December 31, 2003, over five (and thus more than a couple of) years ago. Although plaintiff writes

---

intermittently clean her home, as of March of 2005.

9

extensively about her various current pains and medications (*see* Plaintiff's Affidavit in Opposition, at 2-3), these are not proper legal grounds for a reversal of the ALJ's decision.

In sum, the Court finds that there is substantial evidence in the record to support the ALJ's conclusions that (1) plaintiff's impairments did not meet or equal the criteria set forth by the Listing of Impairments prior to her date last insured, (2) plaintiff's symptoms were not of such severity and intensity as to preclude all work activity prior to her date last insured, (3) plaintiff was able to perform light work prior to her date last insured, and (4) plaintiff could perform her past relevant work prior to her date last insured. For these reasons, the ALJ properly determined that Behling did not suffer from a "disability," as that term is defined in the Social Security Act, prior to December 31, 2003.

### V. CONCLUSION

For the foregoing reasons, this Court grants defendant judgment on the pleadings and affirms the decision of the ALJ. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 6, 2009
Central Islip, NY

\* \* \*

Plaintiff is representing herself *pro se*. Defendant is represented by Diane Leonardo Beckmann, Esq., of the United States Attorney's Office, 610 Federal Plaza, Central Islip, New York, 11722.